Good afternoon. My name is John Young. I represent Robert Smith. The bottom line in this case is that Mr. Smith is autistic and Judge Brown did not know it when he sentenced Mr. Smith and the case was close and everybody in this case should be demanding a resentencing because anything else is unfair to everyone, especially to Judge Brown, but also to anyone who would be involved in executing an autistic man and anything else would be unfair to anyone on whose behalf an autistic man would be executed. Well, autism now, I mean, they don't even use that word so much as people being on the spectrum and there are people that are Asperger's and I'm sure some of them might be judges and law clerks. I mean, it doesn't the spectrum of autism is fairly significant. But if you go back to the time of the crime, would someone have even diagnosed him with autism at that time? When Deborah Stibeck testified in 2010, she was certain that his autism would have been diagnosed at that time. And she testified that he was not only autistic, but he was quite autistic and she was certain that it would have been diagnosed at the time of the trial in 1981 or 1982 or at the time of the first PCR in 1984. The state presented no evidence to the contrary. The state presented no evidence that Mr. Smith was not autistic. The state presented no evidence that Mr. Smith was only slightly autistic. They did continue the 2010 evidentiary hearing so that they could consult an expert and so that their expert could interview Mr. Smith. In the end, their expert never did interview Mr. Smith and they opted not to present evidence. So it gives me an opportunity to argue what's really a missing witness instruction and that is apparently the state agrees with me or does not contest that Mr. Smith is autistic and that it's a pronounced autism as Deborah Stibeck diagnosed it. I have several cause arguments. The simplest one, maybe my favorite one, is to, it's, it's, do you think it's the best argument or is it just a favorite? It's a favorite. It's hard to pick, it's like asking me a favorite child. The arguments are all different. Some are more interesting than others. The simplest one is to simply blame it on the state and say it's the state's reason that this was, the state is the reason that this was not addressed in 1984. In 1984, the first PCR attorney asked for a psychological evaluation. The state objected. Judge Brown denied the motion and that is an objective impediment that was external to the defense. It's, it's simply the state's fault that this wasn't resolved in 1984 when I was in college. I'm sure that the state will point out in the course that this case is quite old, but it's not my fault that the case has gotten so old. It, it should not have taken until 2009 to get to this point. Well, it's so old that like three judges have died on the case already. Judge Thompson, I think, Judge Ferguson, and Judge Roll, right? Judge Bilby also. Oh, I'm four. Okay, I missed one then. Well, let's not. Let's not blaze that. Yeah, let's stop with that. Not to be morbid. No more. Which one of us is next? Yeah. So the case has gotten, has gotten quite old, but it's, it's not my fault. It should have been handled in 1984. It could have been handled in 1995 at the third PCR when I asked for a psychological evaluation. There were competency evaluations. There were Atkins intelligence evaluations, but there was never an evaluation, a psychological evaluation and a psychological review for mitigation. And it really had to have been done, especially in this case. There were so many red flags, or as this court calls them, tantalizing indications in the record. There was clearly a problem here, and there clearly needed to be a psychological evaluation. And Deborah Steinbeck's testimony was that had it been done, it would have diagnosed the autism. Well, what is the relationship between Mr. Smith's diagnosis as autistic and his alleged intellectual disability? I think that autism and intellectual disability or, or mental retardation, as, as we were discussing at the time of the Atkins hearing, go hand in hand. No, they don't necessarily. They're not one in the same. They can be related. And there are people that are autistic that are very intelligent, that have very high IQs. So they're, they're, they're not one in the same. They're not the same at all. There are people who are autistic who are wizards with maybe numbers or, or some other computational, and movies get made about those people. But by and large, autistic people, I, I think there is a coincidence of, of, of autism and mental retardation or lower IQ. What is your understanding of the effects of autism? My understanding, and, and turning to Deborah Steinbeck's testimony, the effects of autism explain the things that really bothered Judge Brown the most when he sentenced Mr. Smith. One of the effects of autism is that Mr. Smith had a very concrete, very simplistic and unrealistic understanding of the crime and, and really complex, a very concrete and simplistic understanding of everything going on around him. Deborah Steinbeck testified that, that Mr. Smith viewed the victim as his new girlfriend and, and that he really didn't understand that a murder was going to take place. One of the things that really bothered Judge Brown was Mr. Smith never understood that the sex that he had with the kidnapped victim was not consensual. As he understood it in his concrete way of reasoning, she agreed and they had sex. And, and he did not and, and does not view that as, as a rape. That's, that's clearly wrong. Judge Brown would have had a better understanding of that. Well, there are two sexual assaults, too, right? Not just one. In the facts of the case. It was repeated, yes. But Mr. Smith cannot read or he cannot intuit any cues or emotions. He describes the victim as being willing, we made love, we had sex. That was, that was not what Judge Brown was expecting to hear. That was not what Judge Brown wanted to hear. And those were the things that were reflected in the special verdict. He said she was a That's a quote from, from Mr. Smith. Well, but if the, if the sex were consensual, doesn't that defeat the special circumstances? No. The, the special circumstances or the aggravating circumstance in this case was the cruelty prong of, of the F-6 aggravator. It was, it was the, the cruelty aggravator. Right. But was it, but it was a rape, it was a murder as part of a rape, right? It was like a felony murder type of situation. Was that the theory of the case? There was a felony murder charge that was given. Yeah. And so if, in fact, it's not, he wouldn't be the first defendant to claim that the sex were, that it was consensual despite the fact that it's not, and that doesn't necessarily equate to autism. I mean, because that would put you in a, if the sex were consensual, it puts you in a better situation in terms of arguing the crime, does it not? Well, I, I think that would be the case. If it were consensual, he wouldn't be convicted of rape, number one, right? Correct. That would be giving Mr. Smith way too much credit. He, he confessed. He confessed five different times. I think they used three of the confessions at trial. In Texas, you have to write down confessions, so the confessions were repeated. He confessed many times to the crime, but he, he never really had an understanding that the rape was a rape and, and not sex. And, and that was the testimony, that was the only testimony at the 2010 hearing on cause and prejudice. The, the testimony was that he does not read social and emotional cues, that he cannot read facial expressions. He cannot tell when someone is in distress. He does not know whether he's doing the right thing. Well, can you tell, can you tell that people don't want to be murdered since there was choking, stabbing, and slitting the throat? And, and that was done by the co-defendant. And that was the surprise that he had. Well, didn't he do choking? Aren't the allegations that he did choking? And, and his explanation for the choking was that when his co-defendant said that they had to kill her, he was thinking that if he choked her into unconscious, unconsciousness, that they could leave, and, and, and leave her behind. He has a very simplistic, very concrete understanding of, of what was going on. Well, I guess that's one explanation. Is it the only explanation? It's, it's not the only, but it, it makes sense when it's viewed in conjunction with his autism diagnosis. Without the autism diagnosis, I agree, it makes no sense at all. And, and that's where Judge Brown was left, and that's why this is so unfair to Judge Brown, is because he was left, the defense really didn't do his job. This was a sentencing. I, I guess, are you, are you taking over with the autism as opposed to the intellectual disability? Or are, I, I mean, I didn't see your briefing as abandoning the intellectual disability, but do you think the autism argument is stronger? I, I briefed the issues in the order that this Court granted a certificate of appealability. And I, I, I may be, I don't know that I would have necessarily briefed the intellectual disability argument, but this Court asked for a, a briefing on that argument. I think the standard is, is relatively difficult because there is a, a presumption of correctness, a pre-ed presumption of correctness, and because Mr. Smith is not currently intellectually disabled. Everyone agrees he's not. It doesn't really have to do with anything. You're representing him, I assume. And you're saying that he's not currently disabled? So what? I, I, I agree. There, there is a so what. This, this case is very old, and the experts in intellectual disability expect that a disability will change over, over years. And it has changed. He's had adequate nutrition. Well, I don't want you to go into the argument, but I just wanted you not to disavow your best argument. Oh, I'm, I'm, I'm not disavowing it at, at all. Well, so the mental disability has to be measured from what time? At the time of the crime. That's hard. Well, not if you're really a good lawyer. I'll try to be. All right. So the, the overwhelming evidence at the, and, and if this is my, my best argument, I'll, I'll, I'll get right to it. The overwhelming evidence at the hearing on the, on the Atkins issue was that when Mr. Smith was in high school, in 1964, he was tested, and his IQ tests were 62, and then six months later, with the practice effect, his IQ test was 71. That is, is part of the intellectual functioning prong. His intellectual functioning... That's low. That's low. That's, that's quite low. Yes. And, and that... And what was his, what was his Stanford score? That was in the, the second and the fifth percentiles. So that was very low. Which meant he was even lower. Which meant he was how far behind his age group? He had... He was actually, I think, off the scale as far as his age group. He was off the scale as far as a first grader would have been. He was, I think, seven or eight years behind his age group. At the age of 15, he was far behind on the Stanford tests that he took. He was far behind on the IQ tests that he took. He was in special education the whole time that he was in school, and yet he failed every single grade in school. So he failed his way all the way through special education. These are things to me that say... He was functioning at a very subnormal level. Intellectually, he was functioning at a very subnormal level in high school, in his high school years, and in his later years, too. As he continued to function, he was never able to hold a relationship. He was never able to hold a marriage. His family testified that they really couldn't have him to family functions because his hygiene just wasn't up to coming to family functions. These are all indicative of intellectual disability or mental retardation. His intellectual functioning was very low, and his adaptive functioning was very low. And that is what our expert said. Now, our expert also tested him, as did the state's expert, and he tested in, I think, 2006, 2005, 2006. He tested at an 89 and at a 93 for an IQ test. So his IQ had gone up. That was after he had been in prison? That was after many years in prison, and that was also after many years of psychotropic medications. And Dr. Thompson testified that he was not at all surprised. The psychotropic medications that he was on, that Mr. Smith was on, would have improved the functioning of his frontal lobes, and as his frontal lobes improved their functioning, Dr. Thompson expected that his IQ test would go up. And the green book, the AAIDD book, expects as well that intellectual disability is not permanent, it's not static, it's a state of functioning. Well, there was conflicting evidence on this point that the district court listened to, is that correct? And so then the district court made certain findings, correct? Exactly. Yes. Is this the district court or is this the state? It was actually in the state court. State trial. State court. This hearing was conducted in the state court. It was in the trial court at that time. And there were factual findings that were made. I think this is fairly a factual issue. And those factual findings included his current intellectual functioning and his current IQ testing. So it — I do have some hurdles, and I acknowledge those hurdles. I don't mean to abandon the argument. I certainly briefed the argument. Well, I hope not. I don't mean to abandon the argument, but I do acknowledge that there are some hurdles in that argument. Well, then why don't you get over the hurdles if you want to win the case? I'm working at them, and second and fifth percentile certainly helps me with those hurdles. 62 and 71 helps me with those hurdles. Special education placement. He was — his immature social functioning, when he was young, the other children in the neighborhood said that he did not know how to play, that he could not carry on a normal conversation. He didn't act like the other children. When he was older, he was a transient, like I said, with no ability to hold a job. His relatives said that they would feed and clothe him. That is not good adaptive functioning at all. When he was very young, he was slow in making sentences. His etiquette, not only his hygiene, but he was also lacking in etiquette. And these are all — all of this which are very lengthy in this case. I would like to ask you, what effect, if any, do you believe that the Supreme Court's opinion in Hall v. Florida has on Smith's case? I'm not recalling Hall v. Florida. If the Court could refresh me. Well, Hall is where that was after — It was decided last year. It was — Justice Kennedy wrote it. And it had to do with where the only factor that was considered in there was the IQ test. And it essentially stood for the proposition that you have to consider more than just the IQ test in assessing the intellectual disability. And I think in a footnote, it also refers to the Arizona statute on how to assess intellectual disability. It's a 2014 case. Okay. And I have read Hall v. Florida. I have not read it recently. I agree that that just matches the definition of intellectual disability. There are two prongs that I really see to intellectual disability. There's a third prong of this that started before age 18. This is not important in my case. It might be important in other cases. But all of this certainly started before age 18. So I'm focusing on adaptive functioning and intellectual — Which is part of the Arizona test, correct? That's correct. Arizona does include adaptive functioning. More than just the IQ test. Yes. And I think any definition of intellectual disability has to include adaptive functioning. It does now, I guess. There were other people, and the neighbors would laugh at Mr. Smith. He did not understand the rules of simple children's games like freeze tag, like Red Rover. He wasn't able to play with the other children because he didn't understand those He was oblivious to social cues. He used to talk like a duck with no understanding that it really graded on the people that he was talking to. He looked down and out, lost, like he didn't have anybody, like nobody cared. To other people, it seemed like he could not think for himself. These are all indicators that are in the definition of adaptive functioning. He was immature, and he did not mix well with other adults. And the people he found to mix with were very marginal as well. And that was part of Dr. Thompson's testimony, was that marginal people tend to associate with other marginal people. And that's what happened in this case. It's true he could do some physical work, but he had trouble with tests and in the neighborhood of 50 jobs. Many of them, they were all very short-term. We did go out and get his Social Security records as part of the Atkins proceeding, and the Social Security records are included in the excerpts of record. It was right at 49 or 51, right at about 50 jobs. In what period of time? It was relatively short. I don't remember the period of time. He was 31 when he was arrested. He was self-supporting from when he was 16, correct? With his relatives feeding and clothing him, as they testified, and also in a transient, relatively homeless nature. He wasn't self-sufficient with a mortgage and a He bounced from marriage to marriage, too, didn't he? Were they also short-lived? Some of them were as short as weeks. They were all short. He was in a marriage when he was arrested, but that had been a short period of time as well. And my recollection is it was a total of five marriages that he was involved in. You want to save time for rebuttal? You have eight minutes. I thought you had five minutes. If that was a hint, I'll take it. It's all right. I cut you off too early. I thought you'd want five minutes. Would you refresh my memory again as to what your favorite argument is with respect to cause? My favorite cause argument is to blame it on the State, for obvious reasons. That's really, I think, the simplest cause argument. The first PCR attorney Had lawyers all the time. He had lawyers. The first PCR attorney asked for a psychological evaluation. And one of the things that we'll point out, that the State will point out, is that the first PCR attorney in 1984, they were asking for a psychological evaluation because they found future dangerousness, which is strange because future dangerousness is not even an Arizona aggravator. It's a Texas aggravator. But Judge Brown had found future dangerousness as part of his special verdict. And so the first PCR attorney wanted to address that. The fact that Judge Brown found future dangerousness is not his fault. It's the attorney's fault. I'm sorry. I'm not understanding why that is the State's fault. Well, that's the sentencing attorney's fault. That's the ineffectiveness claim. The reason that the ineffectiveness claim never got discovered is the State's fault. It's because they objected to Judge Brown. They objected to the psychological evaluation at the time of the first PCR. Ever since 1995, they've been telling me that, well, this should have been done in 1984. And it's clear that there was an attempt made to get a psychological evaluation in 1984. That attempt fell flat. Judge Brown said no. There was also a second PCR in 1987. There was no attempt made to get a psychological evaluation at that point. I think Judge Brown's ruling was already law of the case. And I think that the State will agree with me. They will tell me if I'm wrong. And I'd be delighted to find out that I'm wrong. But I'm certain that second PCR is not an opportunity to raise anything. And if I'm wrong on that, I invite the State to tell me so. Because I would share that with my friends. I'm certain that second PCR is not an opportunity to raise anything. I did raise it in my third PCR, but that just shows how smart I am. It really didn't get anywhere. It was precluded as soon as I raised it. Judge Brown, again, denied funds for a psychological expert. And once again, it didn't get done. You now have five minutes. Do you want to save it? I'll go ahead and save it. Thank you. Good afternoon. May it please the Court. My name is Jeff Sparks, and I represent the Respondent Appley. Good afternoon. Starting first with the claim of intellectual disability, Smith hasn't overcome the presumption of correctness that attaches to the State courts. Are you familiar with Hall? Yes, Your Honor. And would you read Hall as saying you can't have a strict 70-figure cutoff? I would read Hall to say that you can't use 70 as a strict cutoff to preclude additional evidence to include adaptive functioning. You can't just rely on 70 as a basis for saying there's no intellectual. You don't meet the intellectual standard. That's correct. That's how I would understand Hall. Didn't the State court judge do that here? No, I don't believe the State court judge did do that here. What did it? Do you know what his findings were? Yeah, I'd be happy to discuss those. All right. Let's go to his findings, where he says, based on all the evidence the Court finds defendants failed to meet his burden of showing he was mentally retarded, there was insufficient evidence from which this Court could find the defendant exhibited, quote, significantly sub-average general intellectual functioning. That's a quote from the Arizona statute. The Arizona statute says mental retardation means... Significantly sub-average general intellectual functioning, which he said he couldn't find, means a full-scale intelligence quotient of 70 or lower. Isn't that what the district court found, the State court found? That was one of the State court's findings, Your Honor. I would also point out that the statute, and under the current numbering, I believe it's subsection K-5, it does require that a court who's assessing that first prong of intellectual disability, the IQ score, also take into account the standard error of measurement for... What he found was that there was insufficient evidence from which the Court could find that he exhibited sufficiently average general or sufficiently sub-average general intellectual functioning, which was defined as an intellectual quotient of 70 or lower. And he cited Grell as well as the Arizona statute for that. That is correct, Your Honor. And the reason that Hall does not, in effect, render Arizona's statute unconstitutional... Well, I'm not talking about the statute at the moment. I mean, yes, the statute, whether the statute's unconstitutional could be the second question, but whether the finding is adequate here when you find that he doesn't meet the 70 minimum as a basis of his finding that there's insufficient evidence. The reason that the finding is adequate here is first based on the evidence that was presented. First, with respect to his current IQ scores, they were far above... Not the reason. You know, he could have said anything he wanted. This is his finding. His finding is, I'm not suggesting that maybe there wasn't more evidence. I'm suggesting that his finding is that he was below 70. His finding was, quoting the term of the statute, that definition that he found he didn't meet means a full-scale intelligent quotient of 70 or lower. He said he didn't provide evidence that he met that standard. Did he consider anything other than the test in coming to that conclusion? I know that the statute talks about, what, adaptive behavior and certain other things. I haven't come to adaptive behavior yet. Okay. That's the next question. Well, those ideas... Whatever he considered, I'm talking about his finding. Okay. Whatever evidence there is, he made a finding in the conclusion, which says his finding is that there was insufficient evidence from which the court could find that he exhibited this definition set forth in the statute, and that he couldn't find that he met the quotient of 70 or lower. Now, as to the adaptive behavior, he also said that, while unorthodox and unstable, defendants' pre-arrest life did not show, quote, again from the statute, significant impairment in adaptive behavior. Now, adaptive behavior is also defined in the statute, and it's not the same definition as the Supreme Court said was required in Hall, is it? Your Honor, I don't believe that the Supreme Court made any holdings with respect to how states must define it. When you say they made any holdings, you mean it was dictum? I mean, the Supreme Court did say that we should use the clinical tests, and they listed them. As I read Hall, the issue there was that the statute in Florida completely ignored the fact that the medical community takes into account the standard error measurement in IQ, and the Court held that states essentially can't completely ignore that kind of thing. It said more than it can't completely ignore. It said what they had to. It said states thought they could substantively go off on their own, but that's not true, they said, and they gave the examples of the clinical tests that states are supposed to apply. And, for instance, they said any two out of the 11 factors in one of the three tests, but they all were clinical tests, which are, I think, you would find somewhat different from the Arizona definition of adaptive behavior. Well, I think that ---- I guess I know you're going to answer this, but did the State court there make the same mistake that the court in Hall made? And if so, yes or no, and why? How is it the same? How is it different? No, the State court did not make the same error that the court made in Hall. In Hall, the issue was that the IQ score was, I think, 71, and the cutoff was 70. If you don't meet that cutoff, you can't present any additional evidence. And that's not what happened here. Here, the State court's finding on failure to prove subaverage general intellectual functioning, the pronging IQ scores, was based largely in part on his current scores, which were far above that 70 mark. And Dr. Martinez's ---- That's not what the finding says, though. The finding says he didn't meet the definition in the statute. Well, that is the legal standard he's required to make, but he's not arguing that. The standard of 70 or lower? That is the statutory definition, also taking into account the standard error of measurement, which was the error in Hall. Well, the State trial court, I think it was a ---- it's a she. I believe that's correct. It's a she.  It is a she. The State trial court didn't use any number with respect to the level he was functioning. No, I don't believe the State trial court made a specific finding as to what his IQ really is. It found that he didn't meet the specific standard of the statute, which was 70 or lower. Right. That's the definition of the term he used. And the ---- that term is stated at the outset of his opinion, this is the law in Arizona. Then when he made a finding, he said he didn't meet that and quoted the Arizona statute, which includes the term 70 or lower. It's, as you said, Section 5. Do you agree with the ---- with your adversary that it's the time of the commission of the crime that we're looking to? I think that is correct. And the State court did proceed under that assumption. That is addressed, I believe, in the beginning of the State trial court's findings, the idea that based on the language in Atkins talking about the lessened culpability of someone with an intellectual disability, that it would apply whether at the time of the crime or at execution. Isn't it also true, don't you read Hall, that they're telling us the premise is that we're to look at the results of testing when we make this assessment as to intellectual functioning, isn't it? I think the issue in Hall is how we look at the results of the testing and how we interpret those results. Right. But the premise of that is that you look at the ---- you have to look at the testing results.  And we had two testing results here, did we not? One when he was a child and one many years ---- after many years when he was in prison. And the one psychologist looked to the testing that was done when he was a child, and the trial court dismissed that and said, well, we don't know how ---- who administered it. Do you think that that is really defensible after Hall? I think it is based on the totality of the evidence presented here. Both of the psychologists, both Smith's psychologists and the States testified at the Atkins hearing that the specific test that had been given to him when he was a child was not a very reliable test. And even at that time it was given, it was already outdated. And that it hadn't been normed on various populations. So there were already ---- Well, we've got. And it's corroborated by all of his behavior at the time. He was functioning at a level that was very, very low. I don't know that it is corroborated. It is consistent with some of his trouble in school. But as the testimony showed and as the State court found, that was also ---- could very well have been the result of the very difficult childhood and the difficult family life that he had. There were alternate explanations for that. I mean, my view is I don't think the State court just considered the IQ in coming to, but used the word based on all of the evidence. And there was conflicting evidence on that and regarding his intellectual disability. There was a lot of evidence that received. And he was required to show what by clear and convincing evidence, but the court even went and said he hasn't shown by preponderance of the evidence, right? So what was the other evidence? You know, we can, you know, I mean, and what the State court had in its hearing, what was there besides what the appellant's attorney has said, the Petitioner's attorney? Most of that goes to the adaptive functioning. And there, a large part of it was that Smith moved out at the age of 16 and appeared to live fairly independently from that point on out. And there was discussion about the kind of transient lifestyle that he lived. But from both the depositions and the testimony at the hearing, it was shown that it was really a group of friends that he traveled around and moved around with. And that was essentially the lifestyle that they chose to live. They moved around a lot. They were young men, switched jobs often, moved from place to place, and chose to live that kind of a lifestyle. There's really no indication that it was. I want to go back to the adaptive behavior and the State's definition of that term. But Judge Callahan's right. They certainly went into the question of adaptive behavior, which they were required to do. But Judge said that, I mean, that his finding was that they did not show, quote, significant impairment in adaptive behavior. Again, it was under the Arizona statute. Arizona statute says that you measure adaptive behavior by the standard of personal independence and social responsibility expected of its defendant's age and cultural group. Is that the Supreme Court definition of how you determine adaptive behavior? Your Honor, I don't believe that the Supreme Court has defined adaptive behavior. You don't think they said you must use the clinical definitions and gave the clinical definitions in Hall? In Hall, I believe that the Court stated that the medical community's definitions and standards must inform the way that the States address intellectual disability. But I don't know that it ever held that it must exactly adopt those. You can make an argument it didn't hold it and that it's all dictum. But it certainly was the Supreme Court's explanation. And there are differing views on whether you have to follow a Supreme Court dictum. But aside from the fact that you might want to term it dictum rather than holding, there was a, Judge Justice Kennedy gave a fairly lengthy disquisition on the fact that they should follow the clinical definitions. And that was two out of 11 in one. And then they revised them. But they gave clinical terms that you were supposed to find. And that's not what the Arizona statute provides. Again, Your Honor, I don't disagree that the Court did discuss the clinical standards in Hall and it was clear that States can't ignore those. But I don't, again, I don't read the case as requiring States to adopt those. In any case, I don't believe that that helps Smith here because he's conceded that this is essentially a factual determination. He hasn't challenged the validity of the statute under which the Arizona courts found that he was not intellectually disabled. Has the Arizona Supreme Court talked about the adaptive behavior standard? It has, I believe, in Grell. There are several versions of that case. In one of those it did note that Arizona's adaptive behavior definition was not exactly the same as the clinical standards, but it didn't make any comment on it other than that. Well, exactly the same is quite an understatement. There's nothing about the clinical standards. I mean, Arizona has a very general statement about general behavior, and if you agree with what Justice Kennedy and the majority seem to believe, that there are clinical definitions that are medical definitions, and that's what courts should apply. And I think you would agree that's not what this Court applied. It may have heard evidence on it from which it could have drawn conclusions, but it didn't. It made specific findings, and it made the findings required by the Arizona statute in terms of the Arizona statute. Now, where that leaves everybody is another question about which one could disagree. But, yeah, go ahead. I'm not sure you answered Judge Callahan's question of how this case differs. What evidence was in the record that he wasn't — that was before the judge that made the findings that he was not retarded, which was what was his — now it's intellectually disabled, but that was — what evidence in the record was to the contrary that he's not retarded? Yes, Your Honor. And I realize we're talking about his status at the time of the crime. However, his current scores are relevant to that. Both experts tested him around — give or take a few points around an IQ of 90, which is low to low average intellectual functioning. And looking at those earlier tests that were much lower, and the circumstances surrounding them, the unreliability of those tests, the fact that there's no raw data from that testing, there's nothing about the circumstances in which those tests were administered in the record to assess their reliability. The state's expert, Dr. Martinez, testified that it was highly unlikely that a person's IQ could improve that much. In other words, it's highly unlikely that those old scores were truly reflective of his intellectual capacity at that time. So, really, there's no evidence — there's no strong evidence, at least not enough to meet even the preponderance standard that the state court applied, an alternative to the clear and convincing standard that Smith met the first prong of Arizona's definition. And then, as to the adaptive functioning, again, while there was some information about his difficulty playing games as a children and things of that nature, there was also testimony that he was athletic and played sports as a teenager. As I mentioned before, he moved out at age 16 and appeared to live independently. And while he held many different jobs, he was consistently employed. And many of the jobs he held require at least some level of intellectual ability. He was a mechanic, a truck driver, installed cable. So — Did he have any criminal record before this? Nothing significant. So was that before the judge as well? I'm not sure that that was part of what the Court relied on. Well, now, I mean, in terms of — in Hall, the Supreme Court found Florida's approach unconstitutional because it goes against the unanimous professional consensus. Is that the same as saying that they're adopting that definition on a national consensus, and that's what every State has to do, exactly that? It's not. Because I don't read Hall as undoing what the Court held in Atkins, which was to leave to the — generally to leave to the States the procedure and mechanism for identifying intellectual disability. You don't read it as going beyond procedure to substance? Somewhat. And again, as Judge Callahad pointed out, I — the way I understand Hall, the Court was saying that the problem with what Florida did was it was completely ignoring what the medical community says about how to use an IQ test, which is it's not just a number. There's essentially a range. Well, let's say that there is a clear disagreement, I suppose. The Arizona Supreme Court said in Grill that the Arizona statute just requires an IQ test. It then says quite specifically that it doesn't do — although it doesn't say the Supreme Court, it says it doesn't require a finding of mental retardation based, it says, solely on proof of specific defects or defects in only two areas, which is what the Supreme Court talked about in the test. Your view is that the discussion about clinical defects and clinical methods of establishing those is not something that's binding on the States, that the States don't have to follow that system of clinical — looking for clinical defects, but can just apply a general test of its own? I read the decision as essentially telling the States they can't completely disregard those clinical standards, that their definitions must at least be informed by how the medical community assesses these things, but not that the States are required to — that they're precluded, essentially, from coming up with their own definitions, but are required to just accept verbatim the standards that the medical community has applied. Now, Petitioner's never said that this — the Arizona statute was unconstitutional either facially or as applied, correct? That's correct. And you're — if I understand your position, you're saying that Hall does not mandate that conclusion. That's correct. You're right. I'd like you to turn to Petitioner's arguments about autism. Can I ask one question before we get to autism? You are presiding. You certainly may. No, that's not the reason. I just — before we leave this subject, now I've forgotten the question. Hey, that was my point. Yeah. It was about Hall. Hall was decided after all the briefs were written, right? By the States' brief? Yeah. Yes, Your Honor. And the other briefs, Bob's briefs were written. And Hall certainly has a substantial impact on what the States' obligations are in their statutes. I do believe that is correct, Your Honor, but it is our position that it — there's nothing about Arizona's statute that is invalid or unconstitutional after Hall. No, no. I understand that. But if the argument that it is, which is based on Hall, all that arose after briefs were completed. So I assume that if that were a subject of interest, you'd rather — you'd like to brief the issue. If the Court were — we would take that opportunity if the Court would like us to brief the issue. No, no. I mean, if you don't want it, I'm not — believe me, I'm not asking for more briefs than we already have in all these cases. I just mentioned it was an observation that all of this occurred, and what the meaning of Hall is, is something that has not been briefed by either side. But there's such a thing as 28J letters, and neither of you filed a 28J letter on Hall, correct? Correct. And, again, Smith has never challenged the definitions that were applied here, only the factual findings made under those definitions. Well, certainly you wouldn't want us to execute somebody who's — where the statute was unconstitutional or the Supreme Court rules substantively were not met. Absolutely not, Your Honor. But we don't believe that that is the case here. On the autism, what evidence is there that he would have been diagnosed as autistic even if he had been examined in 1980? And what's the relationship between Mr. Smith's diagnosis as autistic and his intellectual disability? There's nothing more in the record on that point other than Dr. Steinbeck's statement that he would have been diagnosed as autistic back at that time. However, he was seen by competency evaluators, and I understand that the purpose of those evaluations was for competency to stand trial, not necessarily to detect autism. But if it's as pronounced as Dr. Steinbeck says it was, it stands to reason that they would have noted something along those lines. Even the later evaluations for the Atkins hearing, which came just, I believe, a year or two before Dr. Steinbeck evaluated Smith, didn't note anything approaching autism or anything of that sort. Not to mention, Dr. Steinbeck did concede at the hearing that the standards, the clinical diagnostic standards that she applied were not the same as those that would have been in use at the time of Smith's trial or his first PCR proceeding. One difference was she talked about the hand-flapping and head-banging that he exhibited relied on that to reach her diagnosis in part. But those criteria were not in those prior versions. So on this record, it's more likely that he would not have been diagnosed, or I think we would see that in the earlier evaluations, at least something. Well, can you tell me what was the evidence that the mitigating evidence that was put on at the sentencing phase? Yes, Your Honor. I think it goes back to the competency evaluations, which did discuss Smith's mental health history. They discussed his ability to appreciate the nature and consequences of his actions at the time of the crime. Those were before the Court that sentenced Smith. There was the pre-sentence report, which was fairly lengthy and went through his difficult childhood, the trouble he had at school. He'd been hospitalized one time, too, right? He had, I believe, in 1970. And that was referenced in the pre-sentence report. I believe he was hospitalized and diagnosed with antisocial personality disorder at that time. Like the competency evaluations, the pre-sentence report discussed his history of depression. That seemed to be his most significant mental health issue. An important fact from the pre-sentence report is it notes that Smith actually refused a psychological evaluation for sentencing purposes. And that's if — Wasn't it a couple of times he was supposed to be transported and he wouldn't go? I believe there were two occasions, it notes. And I think that's very significant when we don't even get to that information unless Smith can show cause to overcome the defaulted claim. Well, yeah, but I find it very difficult. Atkins didn't come out until years later, so no one could have known that he had a right to have an evaluation to see what his intellectual capacity was. And so I'm not sure that his refusal and his behavior and all of that has any relevance at all to this. And Dr. Martinez was the doctor whose testimony the trial court credited. He just said, according to the trial court, that he thought it was unlikely that his functioning could improve as much over the period of his incarceration. But he didn't say anything about what his level was at the time of the crime. So he didn't. But I believe that's for — that's Smith couldn't prove. What's the standard for competency, whether they can understand the nature of the proceedings and assist in their defense? That's correct. I mean, and they look and see what mental illness they have. Right. What would be the significance of that mental illness and how it would play out in your reasoning process, right? That's correct. And in those competency evaluations, one of them discussed the fact that Smith appeared to have average intellectual function. Another noted that he didn't seem to have any organic brain defects or anything along those lines that interfered with his thinking process. So there's really nothing in those competency reports that would have alerted either trial counsel or PCR counsel that there was something that was missed, that there was a big reason to have another evaluation done, especially in light of the fact that he refused an additional evaluation in connection with his sentencing. And that's significant because Smith can't overcome the procedural default here. One of the arguments would be under Martinez. He can't show cause under Martinez unless he can show, among other showings, that his PCR lawyer performance — Are we talking about the autism here? That's correct. Really, any of the new evidence he's presented. But again, there's nothing in those older reports that would indicate to his prior counsel that there was these diagnoses sitting there. These are very recent, after a case that's been going on for decades, that these have been uncovered. And there's nothing in the record back from the time of the trial, from the time of the initial proceedings, that would have indicated to counsel that they missed something or that And I think that's very relevant to — as one of the reasons why Smith has failed to establish any cause to overcome the procedural default of his trial and effective assistance claim. Okay. Thank you, counsel. Thank you, Your Honor. This keeps happening, and it's happened again. The State keeps dismissing the 1964 Otis IQ test as being unreliable, and they never say why they're unreliable. Well, the judge dismissed it as unreliable. It's not just the State. Yes, Judge Jan Kearney also dismissed it as unreliable in her decision. The reason that they're unreliable, and we covered this in the hearing, and I'll cover it again now, because it just keeps happening. The reason that they're unreliable is because of the Flynn effect. This test was normed on a 1920s population, and as the population ages, it turns out that the population keeps getting smarter. And so Mr. Smith, he scored a 62 in 1964. So if he was a 62 compared to a 1924 population, if he was stupid compared to a 1924 population, he was really stupid compared to a 1964 population. So it's unreliable, but it's unreliable in the sense that it is overstating his IQ. So I agree with the State that it is unreliable, but I disagree about the direction in which it's unreliable. Do you think that that factual finding can be overturned? I think that any factual finding can be overturned. There's not an irrebuttable presumption of correctness. There is a presumption of correctness, but that is all. And I think that for those reasons and others, Judge Kearney's decision was wrong, particularly with respect to the intelligence testing. And the intelligence testing was administered by educators, by teachers, who already had Mr. Smith in special education and were obviously concerned about teaching him and placing him and whether to advance him and testing him. So just to say, well, we don't know who performed these tests. These tests are supported by every other test that he took, his SAT tests, his placement in school. There is reference to he worked as a mechanic. Well, there's no evidence that he was ASE certified to be a mechanic. And if he was working as a mechanic, he was working as a mechanic on 1950s and 1960s vehicles, because that's when he was working as a mechanic, would have been in the late 60s and early 70s. Well, but I can't work on those vehicles, and I don't think I'm retarded or intellectually disabled. So, I mean, these are all things that factor in in different ways. But I suspect you could work on those vehicles, Your Honor. They were very simple. I'm mechanically disabled. There has been maybe a change in the law with respect to Hall v. Florida. And obviously this Court is well aware it can sui sponte reach that change in the law. There was ---- Well, you're picking up on that someone asked you that question. But you didn't file a 28J letter, so. No. I did not file a 28J letter. And I think Hall didn't pop right into your mind when I asked you that question. No, it didn't. It was not an issue that I was looking at. So I think standing here, there's probably not a lot that I can add on the question of Hall that the Court has not already considered. Factually, I might be able to continue to help out on the facts, though. There was the State mentioned the antisocial personality diagnosis, and that is included with the supporting documents that are included with the pre-sentence report and the excerpt of record. That same antisocial personality disorder diagnosis on that same page goes on to mention headbanging. And, in fact, what happened at that interview was during the interview, Mr. Smith, who was then 19 years of age, became so agitated during the interview that he hit his head on the wall and knocked himself out. To me, that's not highly indicative of antisocial personality disorder, but it is something really strange, and it's something that really — it's one of those many, many red flags that were out there that should have been looked at. Well, the Court knew that, right? They were supporting documents with the pre-sentence report. I'm not going to say that they were submitted to the Court. The Court's probation officer was aware of them, but I'm not certain that the Court knew that. No. In any case, he did on that same page become upset in the course of an interview and knock himself out on the wall, which is just very unusual behavior. And I see that I'm out of time. Thank you, counsel. Thank you. The case just argued will be submitted. Thank you both. The Court will stand in recess for the day. All rise. The Court for this session stands adjourned.
judges: Schroeder, Reinhardt, Callahan